OPINION
{¶ 1} Defendant-appellant Joseph E. Bennett, Jr. appeals his conviction in the Delaware County Court of Common Pleas on one count of engaging in a pattern of corrupt activity; three counts of theft; five counts of breaking and entering; five counts of vandalism and three counts of possessing criminal tools. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On February 25, 2005, the Delaware County Grand Jury indicted appellant on one count of engaging in a pattern of corrupt activity, a first degree felony; two counts of theft, third degree felonies; two counts of theft, fifth degree felonies; six counts of breaking and entering, fifth degree felonies; six counts of vandalism, fifth degree felonies; and three counts of possessing criminal tools, fifth degree felonies.
 {¶ 3} On July 5, 2005, appellant filed a motion to suppress. On August 17, 2005, the trial court conducted a suppression hearing. The testimony presented established:
 {¶ 4} In July and August 2004, small businesses in Delaware County were the target of vandalism, theft, and breaking and entering. Two incidents involving Norton's Sporting Goods resulted in the theft of firearms. A witness to a break in at Norton's Sporting Goods on July 26, 2004, described a gray or a maroon Dodge Stratus, with a left rear taillight out, leaving the scene.
 {¶ 5} On July 27, 2004, Sergeant Leatherman of the Delaware City Police Department met with individuals he knew to be reliable. They informed him appellant and his co-defendant were involved in the rash of break-ins. They described the car with the left tail light out. The same morning, Officer Boland of the Delaware City Police Department observed the vehicle traveling within the city limits and instructed the driver to pull over. The vehicle was missing the left taillight. Appellant was a passenger in the vehicle which was being driven by his co-defendant, Henry Wolfe. Officer Boland conducted an inventory search of the vehicle and discovered eighty-one rounds of .22 caliber ammunition and a 9mm round in the car's console-matching items stolen from Norton's Sporting Goods. A pry bar, a wrench and a laundry bag, matching a witness' description, were also found in the vehicle. Evidence from the scene demonstrated the doors at the store had been pried open. Officer Boland impounded the vehicle and appellant was taken to the police station for questioning, after which he was released.
 {¶ 6} Detective Wollum of the Delaware County Sheriff's office interviewed appellant, after a BB gun was discovered during a search of appellant's residence. A BB gun had been stolen from Norton's the previous morning. Detective Wollum observed appellant's shoes outside of his cell with glass embedded in the soles. He seized the shoes to be tested for comparison of glass fragments found at the scene.
 {¶ 7} On August 11, 2004 at 4:00 a.m., Deputy Bobb of the Delaware County Sheriff's Department checked a gun store for any break in. He parked his cruiser at the back of the gun store parking lot when a vehicle pulled into the lot from the South. The vehicle's headlights swept over the cruiser and then pulled out of the lot, continuing at a high rate of speed. Deputy Bobb followed the vehicle, "looking for a reason to stop the car to find out why it pulled into a closed business at 4:00 a.m."
 {¶ 8} After a few minutes, Deputy Bobb observed the vehicle cross the double centerline and "the driver side tires touched the left line of the double line." He described the car as "drifting left and weaving at times and the tires would go over both yellow lines and to the edge of the road." The tires went completely over the left line 4-5 times over 1-2 miles. The deputy then initiated a stop. Appellant was the driver of the vehicle, and Wolfe, his co-defendant, was a passenger. Appellant did not possess a valid operator's license. Deputy Bobb conducted an inventory search at the scene, and discovered a large crowbar, vice grips, pliers and a brown bag. Deputy Bobb testified at the suppression hearing he was unsure of any written policy for impounding vehicles and performing inventory searches, but he knew the department had a standard operating procedure.
 {¶ 9} Via Judgment Entry, the trial court overruled appellant's motion to suppress.
 {¶ 10} The matter proceeded to a jury trial on August 23, 2005. During the trial, the State moved to amend count three of the indictment to change the name of the victim from Midway Market to Norton's Sporting Goods. Despite appellant's objection, the trial court granted the motion to amend. After the presentation of the evidence, appellant was found guilty of one count of engaging in a pattern of corrupt activity, three counts of theft, five counts of breaking and entering, five counts of vandalism and three counts of possessing criminal tools. The trial court imposed a two-year prison sentence.
 {¶ 11} Appellant now appeals, assigning as error:
 {¶ 12} "I. THE TRIAL COURT ERRED IN OVERRULING THE DEFENDANT'S MOTION TO SUPPRESS EVIDENCE, THEREBY VIOLATING THE DEFENDANT'S RIGHTS GUARANTEED BY THE OHIO AND UNITED STATES CONSTITUTIONS.
 {¶ 13} "II. THE TRIAL COURT ERRED BY PERMITTING THE PROSECUTION TO AMEND COUNT THREE OF THE INDICTMENT, THEREBY VIOLATING THE DEFENDANT'S RIGHTS GUARANTEED BY THE OHIO CONSTITUTION."
 I {¶ 14} In the first assignment of error, appellant challenges the trial court's denial of his motion to suppress. Specifically, appellant challenges the testimony of Deputy Bobb at the suppression hearing. Appellant argues Deputy Bobb testified he followed appellant's vehicle "in an attempt to get probable cause to stop the vehicle", and finally stopped the vehicle for an alleged marked lanes violation. Appellant argues the alleged marked lines violation occurred on a narrow county road where some areas of the road do not have marked lanes, and the vehicle's driver-side tires were merely observed on the center line or slightly over the center line. Appellant maintains Deputy Bobb changed his testimony to indicate the vehicle's tires were over the center line for three to five seconds on three to four occasions over a distance of about one-mile.
 {¶ 15} Deputy Bobb further testified as to the Delaware County Sheriff's Office's practice and procedure when a driver is operating without a valid license and/or driving under suspension and no other valid driver is available, is for the driver to be placed into custody and the vehicle impounded. Bobb stated it is the policy of the Sheriff's Office to identify the property of the vehicle and take such property into evidence, listing all the valuables found in the vehicle on an impound sheet. However, he testified he had never seen a written policy regarding inventory searches.
 {¶ 16} The inventory search of appellant's vehicle produced a pair of vice grips, a pry bar, a black sweatshirt matching a description of a sweatshirt worn by the perpetrator in one of the incidents as captured on video, and a set of blue handled pliers.
 {¶ 17} In overruling appellant's motion to suppress, the trial court concluded the search was justified as an administrative search, even though no written policy was introduced at the hearing.
 {¶ 18} There are three methods of challenging on appeal a trial court's ruling on a motion to suppress. First, an appellant may challenge the trial court's findings of fact. In reviewing a challenge of this nature, an appellate court must determine whether the findings of fact are against the manifest weight of the evidence. See State v. Fanning (1982) 1 Ohio St.3d 19,437 N.E.2d 583; State v. Klein (1991), 73 Ohio App.3d 486,597 N.E.2d 1141; State v. Guysinger (1993), 86 Ohio App.3d 592,621 N.E.2d 726. Second, an appellant may argue that the trial court failed to apply the appropriate test or correct law to the findings of fact. See State v. Williams (1993),86 Ohio App.3d 37, 619 N.E.2d 1141, overruled on other grounds. Finally, assuming the trial court's findings of fact are not against the manifest weight of the evidence and it has properly identified the law to be applied, an appellant may argue that the trial court incorrectly decided the ultimate or final issue raised in the motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. State v. Curry
(1994), 95 Ohio App.3d 93, 96, 641 N.E.2d 1172; State v.Claytor (1993), 85 Ohio App.3d 623, 627, 620 N.E.2d 906; andState v. Guysinger, supra.
 {¶ 19} Appellant argues the initial traffic stop was not justified pursuant to Terry v. Ohio (1968), 392 U.S. 1. Specifically, appellant argues the alleged marked lanes violation did not constitute reasonable suspicion of criminal activity. Accordingly, appellant concludes the search of his vehicle was not justified as a search incident to an arrest, pursuant toState v. Murrell (2002), 94 Ohio St.3d 489.
 {¶ 20} Upon review of the record, Deputy Bobb testified at the suppression hearing as to his observations of appellant's vehicle:
 {¶ 21} "Q. Did anything unusual happen?
 {¶ 22} "A. Yes, sir. I saw a vehicle pull into the lot. At that time in the morning, it pulled in. As it pulled in, as the lights brushed on my cruiser, I was pretty sure they saw the reflective symbol off the sheriff's cruiser. The people stopped and turned around and went back northbound on Route 3.
 {¶ 23} "Q. Describe the speed of the vehicle as it entered the parking area?
 {¶ 24} "A. The vehicle entered the parking area in a general speed, not too fast, not too slow. As it came into the right, it crested again, reflected off my sheriff on the side. The vehicle stopped, turned around and began to pick up seed [sic], left the parking lot rather quickly, northbound on Route 3, sir.
 {¶ 25} "Q. And what did you do, sir?
 {¶ 26} "A. At that point in time, I began to follow the vehicle in an attempt to get probable cause to stop the vehicle to find out why it may have been coming into that business at 4:00 in the morning.
 {¶ 27} "Q. And tell us what happened?
 {¶ 28} "A. I followed the vehicle for a while on Route 3 northbound. I didn't get any lanes violation at that time. The vehicle then turned left on North Old Three. I followed the vehicle for a while. The speeds were between 45 and 55. It come back and forth and the vehicle crossed the lane of the front lines — sorry, the lines on the road several times, the lines and lanes violation. At that time the vehicle came to Creek Road and made a right. At that time I initiated a traffic stop on the vehicle due to the fact it was crossing double yellow lines, failure to drive within marked lanes and lines.
 {¶ 29} "Q. And you pulled the vehicle over?
 {¶ 30} "A. Yes, sir.
 {¶ 31} "Q. And who was in the vehicle?
 {¶ 32} "A. It was Mr. Bennett and he had another gentleman with him.
 {¶ 33} "Q. And who was driving?
 {¶ 34} "A. Mr. Bennett.
 {¶ 35} "Q. And were you able to determine if Mr. Bennett had a valid Ohio Driver's License?
 {¶ 36} "A. After I went to the car, I asked Mr. Bennett for his driver's licenses [sic], he said he did not have one. I asked Mr. Bennett where it was and he said that it was suspended.
 {¶ 37} "* * *
 {¶ 38} "A. At that time, I had Mr. Bennett step out of the car and since he didn't have a valid driver's license, I told him at that time that I was going to double check and make sure he did — his license was suspended, in which it was. At that time, I put him into my custody.
 {¶ 39} "Q. did you subsequently generate some paperwork as a result of that stop?
 {¶ 40} "A. Yes, sir.
 {¶ 41} "Q. A traffic citation was issued to Mr. Bennett and the vehicle was impounded due to the fact that nobody could legally drive the vehicle."
 {¶ 42} Tr. at 49-51.
 {¶ 43} In Dayton v. Erickson (1996), 76 Ohio st.3d 3, the Ohio Supreme Court held:
 {¶ 44} "The question whether a traffic stop violates theFourth Amendment to the United States Constitution requires an objective assessment of a police officer's actions in light of the facts and circumstances then known to the officer. UnitedStates v. Ferguson (C.A.6, 1993), 8 F.3d 385, 388. Thus, the question whether a Fourth Amendment violation occurred in this case depends upon an objective assessment of the officer's actions at the time of the traffic stop, and not upon the officer's actual (subjective) state of mind.
 {¶ 45} "* * *
 {¶ 46} "We agree with the Sixth Circuit's cogent analysis of the issue. Specifically, we are in complete agreement with the Sixth Circuit that a traffic stop based upon probable cause is not unreasonable, and that an officer who makes a traffic stop based on probable cause acts in an objectively reasonable manner. Accordingly, we adopt the test outlined in Ferguson, supra,8 F.3d at 391-393, and hold that where a police officer stops a vehicle based on probable cause that a traffic violation has occurred or was occurring, the stop is not unreasonable under theFourth Amendment to the United States Constitution even if the officer had some ulterior motive for making the stop, such as a suspicion that the violator was engaging in more nefarious criminal activity." (Emhasis added.)
 {¶ 47} Based upon the above, we find Deputy Bobb had sufficient probable cause to stop appellant's vehicle, and to impound appellant's vehicle.
 {¶ 48} Appellant cites State v. Peagler (1996),76 Ohio St. 3d 496, arguing an inventory search of a lawfully impounded vehicle must be conducted in good faith and in accordance with reasonable standardized procedures or established routine. Appellant argues the State failed to introduce a written policy of the Delaware Sheriff's Office with regard to inventory searches. Appellant concludes, without the evidence obtained from the vehicle search, the result of the trial would have been different.
 {¶ 49} Upon review of the record, Deputy Bobb testified at the suppression hearing as to his office's standard practice and procedure in conducting inventory searches:
 {¶ 50} "Q. So you now stopped him and you are issuing citations and you've determined that he doesn't have a valid driver's license. What's the regular practice of the department when that happens?
 {¶ 51} "A. When someone is found not to have a valid driver's license, generally, one of two things would happen. Most of the time, we issue a citation, take him up to jail, arrest them, issue them a citation and release them is the common practice that we do, at least is what I do.
 {¶ 52} "Q. So was Mr. Bennett actually arrested that night?
 {¶ 53} "A. Yes, sir, he was.
 {¶ 54} "Q. And the reason for that?
 {¶ 55} "A. Driving while under suspension.
 {¶ 56} "Q. And what about the vehicle?
 {¶ 57} "A. The vehicle was impounded, sir, due to the fact that nobody could drive it.
 {¶ 58} "* * *
 {¶ 59} "Q. That was impounded and when a vehicle is impounded, what's your procedure in terms of dealing with the contents of the vehicle?
 {¶ 60} "A. What we do when we impound a vehicle is we make sure that we didn't miss anything, such as drugs, any kind of illegal activity. Since it's being impounded, we're, therefore, responsible for the contents inside. We double check everything inside the vehicle, list all the valuables that are inside the vehicle on the impound sheet.
 {¶ 61} "Q. And did you do that on this particular case?
 {¶ 62} "A. Yes, sir, I did.
 {¶ 63} "Q. I'm going to ask you to refer to, if I may approach, your honor. Refer to the second to last — excuse me, the third from the last page, page five.
 {¶ 64} "The Court: Do you want to identify that? Do you find it necessary to have it identified as D?
 {¶ 65} "Mr. Owen: I did have him identify the first page, your honor.
 {¶ 66} "By Mr. Owen:
 {¶ 67} "Q. Deputy, if you would please look —
 {¶ 68} "The Court: All right, wait a minute. You asked two questions, is the signature on there and are the citations on there. That's all you asked him about.
 {¶ 69} "Mr. Owen: I'll be more than happy to explore further, your honor. I certainly intended to.
 {¶ 70} "The Court: If you would, just to make sure we have a record, what D is.
 {¶ 71} "By Mr. Owen:
 {¶ 72} "Q. As we look at State's exhibit D, why don't you tell the court what that document is for purposes of identifying it?
 {¶ 73} "A. Yes, sir. It is Niber's Uniform Incident Report. Any time we have a criminal offense and we take a report, we fill one of these pages out. On these pages, it usually lists the victim, which in this case would be the State of Ohio, and the charges the individual is being charged with are on the front of this page. At the bottom, the reporting officer, my signature. That shows that I performed this documents and I issued these charges.
 {¶ 74} "Q. And the remainder of the pages?
 {¶ 75} "A. The remainder of the pages, as you go to the second page back, that's the back of the front page. Our double-sided copier probably didn't work that night. So what I did, I just made a copy of the back page. Again, that's going to show the reporting person, that's myself, the vehicle, which vehicle was involved with this and there's a short narrative leading to the long narrative, explaining briefly dates and times stated, the vehicle. I'm in a traffic offense. Basically, the probable cause right here, why we stopped.
 {¶ 76} "Q. As you review the remainder of that document —
 {¶ 77} "A. Yes, sir. Do you want me to go to the third page?
 {¶ 78} "Q. Would you identify that page?
 {¶ 79} "A. Okay. The third page is going to be your suspect arrest page. Basically, anybody you arrest, or you come into contact with, maybe he's a suspect, or maybe — it's just an identification page. Basically, the person, who it is; if they're being charged or not being charged. For example, Joseph Bennett is on this page. The associated person would be Henry Wolfe. Now that I look, it says passenger. As you go down further, it explains the charges that are issued the individual. Time of arrest, where he was arrested, if he's slated or bonded out, the fingerprint card. It's basically his information and what he is being charged with, sir.
 {¶ 80} "Q. And the next page, that would be page four?
 {¶ 81} "A. Yes, sir. The next page I have is the property record. Anytime we put property into our property evidence room, it is listed and notated what is put in and how it's put in, the date and time by the person. As you see on this list, at the top there is what crime was offended, there we located the property, what we put into the evidence room name of the person who submitted the property, we obtained it from, and my signature, of course."
 {¶ 82} Tr. at 52-56.
 {¶ 83} A police officer's assertion an inventory search was done pursuant to a police department policy is not sufficient, standing alone, to meet the State's burden of proving that a warrantless search was reasonable because it fits within the inventory search exception to the warrant requirement. State v.Wilcoxson (July 25, 1997), Montgomery App. No. 15928. "Rather, the evidence presented must demonstrate that the police department has a standardized, routine policy, demonstrate what that policy is, and show how the officer's conduct conformed to that standardized policy." Id. Testimony introducing standard policy procedures, although not in writing, is sufficient to show lawful reasons for impoundment. See State v. Semenchuk (1997),122 Ohio App.3d 30, 40, 701 N.E.2d 19, 25-26; State v. Cook
(2001), 143 Ohio App.3d 386.
 {¶ 84} A review of Deputy Bobb's testimony indicates the police department had a standard, routine policy and officer Bobb conformed his search to said policy. Therefore, Appellant's first assignment of error is overruled.
 II {¶ 85} In his second assignment of error, appellant argues the trial court erred in permitting the State to amend the indictment.
 {¶ 86} Count three of the indictment alleged:
 {¶ 87} "THE JURORS OF THE GRAND JURY of the State of Ohio, within and for the body of the County of Delaware, on their oaths, in the name and by the authority of the State of Ohio, do find and present that on or about the 26th day of July 2004, in Delaware County, Ohio JOSEPH E. BENNETT,
 {¶ 88} "In conjunction with Henry Wolfe did, with purpose to deprive Midway Market, the owner, of property or services, to wit: handguns, pellet and/or BB guns, knowingly obtain or exert control over said property or services, without the consent of Midway Market, the owner, or persons authorized to give consent, said property being firearms,
 {¶ 89} "this being in violation of Section 2913.02(A)(1) of the Ohio Revised Code and against the peace and dignity of the State of Ohio."
 {¶ 90} After the second day of trial, the State moved the trial court to amend Count Three to change the identity of the victim from Midway Market to Norton's Sporting Goods. The next day, the trial court granted the motion.
 {¶ 91} Appellant cites Article I, Section 10 of the Ohio Constitution, providing, "[N]o person shall be held to answer for a capital, or otherwise infamous crime, unless on presentment or indictment of a grand jury." Where one of the vital elements identifying the crime is omitted from the indictment, it is defective and cannot be cured by the court as such a procedure would permit the court to convict the accused on a charge essentially different from that found by the jury. State v.Headley (1983), 6 Ohio St.3d 475.
 {¶ 92} Ohio Criminal Rule 7, provides in pertinent part:
 {¶ 93} "(D) Amendment of indictment, information, or complaint
 {¶ 94} "The court may at any time before, during, or after a trial amend the indictment, information, complaint, or bill of particulars, in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged. * * *" (Emhasis added.)
 {¶ 95} The rule clearly permits errors of omission to be corrected during the course of or even after the trial, as long as such amendment makes no change in the name or identity of the crime charged. Crim.R. 7(D). State v. O'Brien (1987),30 Ohio St.3d 122. If the amendment does not change the name or identity of the crime charged, an abuse of discretion standard is applied to review the trial court's decision to allow a Criminal Rule 7 amendment. State v. Beach (2002), 148 Ohio App.3d 181. An abuse of discretion connotes more than an error of law or judgment; it implies a decision that is unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217.
 {¶ 96} Upon review of the record, the motion to amend the indictment did not change the name or the identity of the crime charged, nor did the amnedment relate to an element of the offense. Rather, the State moved to amend the indictment to conform to the evidence. Accordingly, the trial court did not abuse its discretion in granting the State's motion to amend the indictment.
 {¶ 97} Appellant's second assignment of error is overruled.
 {¶ 98} For the reasons set forth supra, appellant's conviction in the Delaware County Court of Common Pleas is affirmed.
Hoffman, J. Wise, P.J. and Farmer, J. concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, Appellant's conviction in the Delaware County Court of Common Pleas is affirmed. Costs assessed to appellant.